# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

### DOUGLAS SHANE TAMCKE,

Debtor.

Case No.  **09-60833-12**

## *MEMORANDUM of DECISION*

At Butte in said District this 14th day of January, 2010.

In this Chapter 12 bankruptcy, after due notice, a hearing was held December 10, 2009, in Butte on confirmation of Debtor's Second Amended Chapter 12 Plan filed December 8, 2009. The Chapter 12 Trustee, James D. Volk of Great Falls, Montana, appeared at the hearing as did James A. Patten of Billings, Montana on behalf of the Debtor, Ross P. Richardson of Butte, Montana on behalf of Lena Tamcke, John Grant of Helena, Montana on behalf of Peoples Bank of Deer Lodge (the "Bank"), and Timothy C. Fox of Helena on behalf of Diversified Financial Service, LLC.  William Bandy, Jim Lane, Debtor, Lena Tamcke ("Lena"), Scott Heaffner and Mark Anderson testified.  Debtor's Exhibits A, B and C, Lena's Exhibit A-1, and the Bank's Exhibits A through J were admitted into evidence.

This Court has jurisdiction of this Chapter 12 bankruptcy case under 28 U.S.C. § 1334(a). This is a core proceeding involving confirmation of a plan under 28 U.S.C. § 157(b)(2)(L).  The parties' memoranda have been filed and reviewed by the Court together with the record and applicable law.  This Memorandum of Decision sets forth the Court's findings of

1

Created by Neevia Document Converter trial version http://www.neevia.com

fact and conclusions of law.

BACKGROUND

Debtor and Lena were formerly married and have three children.  During their marriage, Debtor's parents gifted to Debtor and Lena much of the real property that is included in this bankruptcy, with the understanding that Debtor's parents could continue to live in their home on the property.  Debtor's parents' home is located in Section 4 of Debtor's property.

During their marriage, Debtor and Lena, on or about July 6, 2006, either borrowed or assumed existing debt of $850,000 from the Bank.  The loan is secured by a Real Estate Mortgage dated the same date.  The Note and Mortgage to the Bank were modified on October 26, 2007.  The payoff on the aforementioned obligation as of July 8, 2009, was $985,172.66.

Debtor and Lena also borrowed an additional $371,898.99 from the Bank on July 6, 2006.  Said loan is similarly secured by a Real Estate Mortgage (Mortgage Loan No. 8009927-20).  Mortgage Loan No. 8009927 was modified on October 26, 2007.  The payoff on Loan No. 8009927 was $256,352.12 as of July 8, 2009.

Debtor and Lena dissolved their marriage pursuant to a Marital and Property Settlement Agreement and Consent to Entry of Decree dated August 22, 2008.  Under the Marital and Property Settlement Agreement and Consent to Entry of Decree, Debtor and Lena divided their assets and liabilities, with Debtor receiving the real property and the debt thereon, while Lena was to receive $285,000, pursuant to the following provisions:

> Lena shall execute all deeds and documents of conveyance necessary to transfer said property to Shane, including any Quit Claim Deeds relating to the real property.  Upon execution of this Agreement, Lena will execute a Quit Claim Deed to the ranch property which will be held in escrow . . .  Simultaneous with Lena's name being removed from the real estate note, operating note and cattle

2

Created by Neevia Document Converter trial version http://www.neevia.com

note or their pay-off at People's Bank, or the notes being refinanced by Shane, the Quit Claim Deed will be recorded.

Upon execution of this Agreement, Shane will execute a Deed of Trust to Lena, as a second mortgage, in the amount of Two Hundred Eight-Five Thousand and No/100 Dollars ($285,000.00) with the ranch property as collateral.

* * *

4.6.    Cash Payment to Lena.  Shane agrees to pay to Lena the sum of Two Hundred Eighty-Five Thousand and No/100 Dollars ($285,000.00) in three installments as follows:

a.    The first installment shall be in the amount of Seventy-Five Thousand and No/100 Dollars ($75,000.00) and is due within ninety (90) days of execution of this Agreement.  Said sum shall be paid through Great Western Escrow Corp.

b.    The second installment shall be in the sum of Ten Thousand and No/100 Dollars ($10,000.00) and shall be paid when the final payment is due on the Expedition note with People's Bank, being 2/15/2009.  After the payment is made, the difference between the payment and $10,000 shall be paid to Lena through Great Western Escrow Corp.

c.    The third and final installment shall be paid on or before one year from the effective date of this Agreement, same being August 22, 2009 in the amount of Two Hundred Thousand and No/100 Dollars ($200,000.00), to be paid through Great Western Escrow Corp. Upon payment of the final installment, the Deed of Trust held by Lena shall be fully reconveyed and the ranch property released.

* * *

7.    Release and Waiver.  Subject to the provisions of this Agreement, each of the parties may in any way dispose of his or her property of any nature whatsoever, whether real, personal, or mixed.

* * *

Each party shall have the right to dispose of his or her separate property, both real and personal, as effectively as if the parties had never been married.

3

Created by Neevia Document Converter trial version http://www.neevia.com

Debtor did not make the regular annual payments that were due the Bank on February 15, 2009.  Debtor was also not able to make any of the property settlement payments owed to Lena under the Marital and Property Settlement Agreement and Consent to Entry of Final Decree.

Debtor originally sought protection under Chapter 13 of the Bankruptcy Code on May 10, 2009.  At that time, Daniel R. Sweeney of Butte, Montana was Debtor's sole counsel of record. Debtor then filed on June 18, 2009, a motion to dismiss this case on grounds that "Debtor's secured debt is more than the required amount to be eligible for a Chapter 13," but later withdrew the motion to dismiss on June 30, 2009.  Debtor's withdrawal of the motion to dismiss was accompanied by a motion to convert to Chapter 12.  Following a hearing July 14, 2009, the Court entered a Memorandum of Decision and Order on July 22, 2009, converting Debtor's bankruptcy case to Chapter 12 of the Bankruptcy Code.  Thereafter, Debtor filed an application to employ James A. Patten, Craig D. Martinson and the Patten, Peterman, Bekkedahl & Green law firm as general bankruptcy counsel on August 31, 2009, which application was approved on September 15, 2009.  Since September 15, 2009, attorney James A. Patten has acted as Debtor's lead counsel.

Debtor's Schedules filed May 23, 2009, show that Debtor's monthly income is approximately $5,865.00.  That amount is derived from rents of $3,865.00 and log sales of $2,000.00.  Debtor's monthly expenses, excluding any plan payments or payments to the Bank or Lena, are $3,225.00.[1]  Debtor's Statement of Financial Affairs shows that Debtor's year-to-date business income in 2009 was $18,617.50, of which $15,617.50 was from cattle sales and

---

[1] Debtor's monthly expenses of $3,225.00 include monthly [child support] of $300.00 to Lena.

Created by Neevia Document Converter trial version http://www.neevia.com

$2,500.00 was from hay sales.  As of May 2009, Debtor also had $30,621.00 in auction income and $10,000.00 in rental income.  In 2008, Debtor had rental income of $1,500.00, personal income from ranching of $4,950.00, logging income of $4,123.10, guiding business income of $4,950.00, hay sales of $26,000.00 and cattle sales of $244,869.60.  In 2007, Debtor had hunting rent of $3,000.00, USDA payments of $234.00, hay sales of $20,000.00, cattle sales of $216,930.89, personal income from ranching of $1,500.00 and logging income of $10,000.00. Debtor does not list any cattle in his schedules and thus, Debtor cannot rely on cattle sales to fund a Chapter 12 plan.  Absent cattle sales, Debtor's income was $34,734.00 in 2007, $41,523.10 in 2008 and $12,500.00 for the first four and one-half months of 2009.  Debtor's reported income in 2009 is something less than his monthly projected income shown on Schedule J and is not adequate to cover Debtor's monthly living expenses of $3,225.00, which living expenses, as noted earlier, do not include any payments to the Bank or other secured creditors.

Debtor filed a Chapter 12 plan on October 19, 2009, an amended Chapter 12 plan on November 12, 2009, and a Second Amended Chapter 12 Plan on December 8, 2009.  Not a single party has filed a written objection to confirmation of Debtor's Second Amended Chapter 12 Plan.  However, Diversified Financial Service, LLC, Lena and the Bank filed objections to Debtor's prior Chapter 12 plans.  According to counsel for Debtor and Diversified Financial Service, LLC, the objections to confirmation filed by Diversified Financial Service, LLC are resolved by an agreement that will require an additional amendment to Debtor's Plan.  Debtor's counsel also indicated that amendment to Debtor's Second Amended Chapter 12 Plan is necessary to correct other minor errors.

Notwithstanding the need for minor amendments to Debtor's Second Amended Chapter

5

Created by Neevia Document Converter trial version http://www.neevia.com

12 Plan, Debtor urged the Court to proceed with the confirmation hearing to address anticipated

objections by Lena and the Bank.  Debtor's Second Amended Chapter 12 Plan provides for a

payment of $4,500.00 upon confirmation and a payment of $2,150,612.00 by December 31,

2012.  Debtor contemplates making the $2,150,612.00 payment by liquidating his real property

as follows:

> (a) Effective immediately and continuing until December 31, 2010, the Debtor shall seek the sale of the following property all lying in Twp. 6 North, Rge. 10 West:

> > (i)   Sec. 3 less Tract A shown on Certificate of Survey 604FC;
> > (ii)  Sect. 6; and
> > (iii) W½ Sec. 5.

> (b) Commencing January 1, 2011 and continuing until July 1, 2012 the Debtor shall seek the sale of the property described in subparagraph (a) above and the following property all lying in Twp. 6 North, Rge 10 West;

> > (i)   E½ Sec. 5; and

> (c) If the property identified in paragraphs (a) and (b) have not been sold by July 1, 2012, the Debtor shall cause all of the foregoing property and Sec. 4 E½, W½SW¼ and Tract A Certificate of Survey 605 FC and Certificate of Survey 604 FC to be liquidated by auction sale by December 31, 2012.

Debtor owns a substantial amount of real estate.  Debtor testified that improvements on

the real estate include a hunting cabin, his parents' home and Debtor's personal residence.

Debtor's Schedule A filed May 23, 2009, lists two parcels of real property, both located at 412

Perkins Road.  An Appraisal prepared by William. H. Bandy ("Bandy") dated July 1, 2009,

includes all the property listed above, as referenced in Debtor's Second Amended Chapter 12

Plan, as well as Section 4: SE¼SW¼.  Bandy lists the address of the appraised property as 1511

Perkins Road, Deer Lodge, Montana.  Bandy's appraisal does not include Debtor's personal

6

Created by Neevia Document Converter trial version http://www.neevia.com

residence, but includes the hunting cabin and Debtor's parents' home.  Bandy appraises the aforementioned property as of July 1, 2009, at $3,000,000.00.  A contribution valuation summary on page 16 of Bandy's appraisal shows that Bandy assigned the following contributions to the listed zones of value:

| | | |
|---|---|---|
| Building Sites | 10 acres utilized @ $40,000/site | 120,000 |
| Building improvements | Residence and Outbuildings | 100,000 |
| Improved Dry Grazing | 67.8 Acres @ $850/acre | 57,630 |
| Rangeland/Timberland | 1518.42 Acres @ $750/acre | 1,138,815 |
| Flood & Hand Line Irrigated | 376.9 Acres @ $2000/acre | 753,800 |
| Pivot & Wheel Line | 259 Acres @ $2500/acre | 647,500 |
| Sub-irrigated Land | 120 Acres @ $1500/acre | 180,000 |
| USFS Grazing Permit | 62 AU June 15 to Oct 1 @ $400/AU | 24,800 |
| Total Value Estimate | Rounded | $3,022,545 |

In the event Debtor is not able to sell his real property as proposed, Debtor then proposes to auction Section 3, less Tract A shown on Certificate of Survey 604FC, Section 6, Section 5 and Sec. 4 E½, W½,SW¼ and Tract A Certificate of Survey 605 FC and Certificate of Survey 604 FC.  Bandy's appraisal includes the above property as well as the SE¼SW¼ of Section 4. Tract A shown on Certificate of Survey 604FC apparently relates to Section 3.  It is not clear from the foregoing whether Tract A Certificate of Survey 605 FC is the same as the SE¼SW¼ of Section, where Debtor's parents' home is located.  Therefore, it is not clear to this Court whether Debtor ever proposes to sell or auction his parents' home and it is similarly not clear whether Debtor proposes to sell or auction his personal residence at 412 Perkins Road, Deer Lodge, Montana.

Created by Neevia Document Converter trial version http://www.neevia.com

CONTENTIONS of the PARTIES

Lena, who is Debtor's former spouse, objects to confirmation of Debtor's prior plans arguing that Lena is a co-owner of Debtor's real property and that Debtor cannot dispose of Lena's property interests without Lena's consent or specific authorization.  Lena also argues that Debtor's Chapter 12 plans fail to satisfy 11 U.S.C. § 1225(a)(3) and are not proposed in good faith.  Lena also argues that Debtor's proposed interest rate of 4.25% does not adequately reflect Lena's risk and that as a result, Debtor's Chapter 12 plans do not satisfy the requirements of 11 U.S.C. § 1225(a)(5).  Lena next argues that she is entitled to recover attorney fees, that Debtor's plans fail to provide sufficient information to determine if the plans meet the feasibility requirements of 11 U.S.C. § 1225(a)(6), that Debtor should not be permitted to impose conservation easements on Sections 5 and 6 of his land, and that the decision to accept or reject an offer should be with the Chapter 12 Trustee, and not Debtor.  Finally, Lena maintains that Debtor's proposal to list his property exclusively with Realty West/Lane and Associates is "absurd" and that Debtor should be required to list his property with multiple real estate agents.

The Bank contends that Debtor's plan is not proposed in good faith under 11 U.S.C. § 1225(a)(3), that the "value of the property to be distributed under the plan is less than the amount that would be received by [the Bank] in the event of liquidation - 1225(a)(5)[,]" that Debtor will not be able to make the payments under the plan, that Debtor is not proposing to cure the default owed to the Bank in a reasonable time and that Debtor is not proposing to pay the Bank its contract rate of interest.  In a subsequent objection filed December 2, 2009, the Bank also objects to confirmation of Debtor's Chapter 12 plan on grounds that "Debtor does not propose to pay the amount of Creditor's allowed secured claim dated July 16, 2009, - 1225(a)(5)."

8

Created by Neevia Document Converter trial version http://www.neevia.com

The Bank filed Proof of Claim No. 16 on July 16, 2009, asserting a secured claim of $1,251,510.29.  The aforementioned amount appears to include $9,885.51 owed by Debtor to the Bank for Lena's 2004 Ford Expedition.  Debtor's Second Amended Chapter 12 Plan provides for the $9,885.51 obligation, plus an additional $1,241,525.00.  The foregoing shows that Debtor's Second Amended Chapter 12 Plan understates the amount owed to the Bank by $99.78.  The contract rate of interest on the obligations owed to the Bank presently range from 6.25% to 6.50%.  Debtor's Second Amended Chapter 12 Plan contemplates an interest rate of 4.25%.

Lena filed her Proof of Claim on November 12, 2009, asserting a secured claim of $299,786.06.  Lena's Proof of Claim appears to include the $9,885.51 owed on the 2004 Ford Expedition.  If Debtor pays the balance owed to the Bank for Lena's 2004 Ford Expedition, he should not be required to then pay Lena the same amount.  Lena contends her claim is entitled to interest at the rate of 10%.

DISCUSSION

**1.	The extent of Lena's interest in Debtor's real property.**

The first issue the Court must address is Lena's contention that she is a co-owner of the real property listed in Debtor's schedules.  After reviewing applicable law, the Court concludes that Debtor is the sole owner of the real property at issue in this case.  This Court notes that it is obligated to give full faith and credit to existing court judgments, such as the Marital and Property Settlement Agreement and Consent to Entry of Decree entered by the Montana Third Judicial District Court, Powell County.

The extent of a party's interest in real property is determined pursuant to state law.  *Estate of Catli v. Catli (In re Catli)*, 999 F.2d 1405, 1406 (9th Cir. 1993).  MONT. CODE ANN. ("MCA")

9

Created by Neevia Document Converter trial version http://www.neevia.com

§ 40-4-202(3) provides: "Each spouse is considered to have a common ownership in marital property that vests immediately preceding the entry of the decree of dissolution... The extent of the vested interest must be determined and made final by the court pursuant to this section." MCA § 40-4-202(1) continues that the court "shall...finally equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or the wife or both." This is precisely what Debtor's and Lena's final decree did–it finally and equitably apportioned both the marital assets and the marital debts of the parties. Under the dissolution laws of the State of Montana–where all prior interests in marital property are extinguished and new interests are created by virtue of a final decree–as read in conjunction with the Supreme Court's holding in *Farrey v. Sanderfoot*, 500 U.S. 291, 111 S.Ct. 1825, 114 L.Ed.2d 337 (1991), Lena's legal and equitable interest in the couple's real property was terminated and Debtor's new interest was created. The only interest Lena has in the property after entry of the final decree, and until the Quitclaim Deeds are recorded, is a record interest, and nothing more.

The foregoing conclusion is consistent with Lena's secured proof of claim. Lena's rights in this case stem from being a secured creditor and not a co-owner of any property. As a consequence, subject to the Bankruptcy Code and Rules, Debtor can dispose of his real property without Lena's consent or specific authorization. Lena's objection to confirmation on this point is thus overruled.

**2.     Whether Debtor can list his real property for sale exclusively with Realty West/Lane and Associates.**

Lena argues that Debtor should not be permitted to list his real property for sale exclusively with Realty West/Lane and Associates. Instead, Lena argues that the Court should

10

Created by Neevia Document Converter trial version http://www.neevia.com

require Debtor to co-list his property with multiple real estate agents.  Jim Lane of Realty

West/Lane and Associates testified that he currently has an exclusive listing to sell a portion of

Debtor's real property.[2]  Jim Lane testified that in his opinion, an exclusive listing enhances a

realtor's ability to market and sell real property.

Lena, through her witness Scott Heaffner ("Heaffner"), sought to convince the Court that

co-listing Debtor's property with multiple real estate agents is more appropriate.  After closely

observing the demeanor of the witnesses while testifying under oath and cross examination, the

Court finds that William Bandy, Jim Lane and Mark Anderson are credible witnesses.  However,

the Court assigns no weight to Heaffner's testimony.  *Allen v. Iranon*, 283 F.3d 1070, 1078 n.8

(9th Cir. 2002); *Public Fin. Corp. v. Taylor (In re Taylor)*, 514 F.2d 1370, 1373-74 (9th Cir.

1975);  *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518

(1985); *See also*, *Casey v. Kasal* , 223 B.R. 879, 886 (E.D. Pa. 1998).  Heaffner's credibility is

undermined by his own testimony. First, Heaffner testified that he is licensed as a real estate

broker, mortgage broker, securities dealer and insurance agent.  Heaffner also testified that he is a

multi-business owner and has ranching experience because his wife's family owns a ranch in

eastern Montana.   Heaffner has been a licensed real estate broker for approximately 8 months.

The fact that Heaffner holds several licenses does not convince this Court that Heaffner is an

---

[2]  Debtor filed on June 4, 2009, an application to employ "James C. Lane of Realty West-
Lane & Assoc."  Under the attached listing contract, Jim Lane was retained by Debtor to market
and sell approximately 343.98 acres described as Section 3, T6N, R10W, during the period of
time from October 21, 2008, through October 21, 2009.  Debtor was asking $1,450,000 for the
property, which price included a hand line, wheel line and pivot.  Debtor filed another
application to employ Jim Lane on October 1, 2009, seeking to market and sell unidentified
portions of Debtor's real property on a 6% contingency fee basis.   Said application to employ
was approved by the Court on October 2, 2009.

Created by Neevia Document Converter trial version http://www.neevia.com

experienced real estate broker, particularly as to ranch property.

Heaffner and Lena testified that Lena retained Heaffner in February of 2009 to sell Debtor's real property.  Heaffner and Lena also testified that at that time, Heaffner had a buyer who was willing to purchase Debtor's real property for $2.1 million.  Neither Heaffner nor Lena produced a listing agreement, an offer to purchase or the name of the alleged prospective purchaser.  Moreover, neither Heaffner nor Lena approached Debtor or Jim Lane with the alleged offer.  Heaffner testified that the only person he discussed the matter with was Lena's divorce counsel.  Heaffner's proposed commission on the alleged $2.1 million sale was 10%.

Heaffner also testified that he has never co-listed a ranch and in fact, his listings are generally exclusive listings, such as the listing that Debtor has with Jim Lane.  In sum, Heaffner's testimony does not convince this Court that Debtor should co-list his real estate with multiple real estate agents or brokers.  Rather, the Court is persuaded by Jim Lane who testified that co-listings are often detrimental because the real estate agents are not willing to put a lot of time, effort or money into marketing property that may ultimately be sold by someone else. Accordingly, Lena's objection to Debtor's exclusive listing with Jim Lane is overruled.

### 3.    Whether Debtor's Second Amended Chapter 12 Plan meets the requirements of 11 U.S.C. § 1225.

Confirmation of Chapter 12 plans is governed by 11 U.S.C. § 1225, which requires in relevant part[3]:

(a) Except as provided in subsection (b), the court shall confirm a plan if —

(3) the plan has been proposed in good faith and not by any means forbidden by

---

[3]  The Court will not address those provisions of 11 U.S.C. § 1225 that were not raised in an objection be either Lena or the Bank.

12

law;

* * *

(5) with respect to each allowed secured claim provided for by the plan–

    (A) the holder of such claim has accepted the plan;

    (B)(I) the plan provides that the holder of such claim retain the lien securing such claim; and

      (ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or

    (C) the debtor surrenders the property securing such claim to such holder; and

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

### a.      11 U.S.C. § 1225(a)(3).

The Bankruptcy Code implies a requirement of good faith in the filing of any bankruptcy petition. *In re Turner*, 71 B.R. 120 (Bankr. D.Mont. 1987). Similarly, confirmation of a Chapter 12 plan is only permitted if, among other things, "the plan has been proposed in good faith and not by any means forbidden by law[.]" 11 U.S.C. § 1225(a)(3). The standard used in assessing a debtor's good faith depends on the context in which the conduct is being assessed. With respect to confirmation, the United States District Court for the District of Montana in *Traders State Bank of Poplar v. Mann Farms, Inc. (In re Mann Farms, Inc.)*, 7 Mont. B.R. 237 (D.Mont. 1989), discussed certain criteria to consider in deciding whether a plan is proposed in good faith. Many of the criteria discussed in *Mann* do not apply in a case such as this where Debtor is proposing to make his Chapter 12 plan payments by liquidating assets. However, "[T]he important point of inquiry is the plan itself and whether such plan will fairly achieve a result

Created by Neevia Document Converter trial version http://www.neevia.com

consistent with the objectives and purposes of the Bankruptcy Code." *Id.*, quoting *In re Lewis Indus.*, 75 B.R. 862, 871 (Bankr. D.Mont. 1987).

For reasons the Court will discuss below, the Court finds that Debtor's Second Amended Chapter 12 Plan is not entitled to confirmation. That fact, however, does not mean that Debtor's plan was not proposed in good faith. Debtor testified that he sold all his cattle with the hopes of paying some of his obligations, including his obligation to Lena. The fact that Lena is financially distressed because Debtor did not make the payments under the Marital and Property Settlement Agreement and Consent to Entry of Final Decree does not morph Debtor's bankruptcy case into a bad faith filing. Moreover, Debtor's desire to save his and his parents' home, while perhaps not achievable at the end of the day, does not imply that Debtor proposes his Chapter 12 Plan in bad faith. In sum, Lena's and the Bank's naked assertions that Debtor's Chapter 12 Plans are proposed in bad faith are not supported by the record and thus, the objections to confirmation of Debtor's Second Amended Chapter 12 Plan based upon § 1225(a)(3) are overruled.

    **b.**    **11 U.S.C. § 1225(a)(5).**

Subsections (A) and (C) of § 1225(a)(5) do not apply in the instant case because the Bank and Lena do not accept Debtor's Second Amended Chapter 12 Plan, and Debtor's Plan does not surrender any property which secures the claims of the Bank and Lena. Section 1225(a)(5)(B)(ii) requires that the value of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim. A leading commentator notes that the present value requirement of § 1225(a)(5)(B)(ii) is identical to the present value requirements of § 1129(a)(9), § 1129(b)(2)(A)(i)(II) and 1325(a)(5)(B)(ii), and therefore case law interpreting those provisions is equally applicable to determining present value under §

Created by Neevia Document Converter trial version http://www.neevia.com

1225(a)(5)(B)(ii).  8 COLLIER ON BANKRUPTCY, ¶ 1225.03[4][c] (15th ed. 2005); *see also In re Hungerford*, 19 Mont. B.R. at 113-14 (cases construing cramdown statutes under Chapters 11 and 12 provide valuable interpretation of Chapter 13).

One aspect of determining whether a creditor or creditors are receiving the allowed amount of their claims requires courts to look at a debtor's proposed interest rate.  In Chapter 12 cases this Court has determined the cramdown interest rate by using a formula, starting with a base rate (either the prime rate or the rate on treasury obligations) and adding a "risk factor" based on the risk of default and the nature of the security.  *See In re Fowler*, 903 F.2d 694, 697-98 (9th Cir. 1990); *In re Schaak*, 17 Mont. B.R. 349, 355-57 (Bankr. D. Mont. 1999); *In re Janssen Charolais Ranch, Inc.*, 73 B.R. 125, 127-28 (Bankr. D. Mont. 1987); *Hungerford*, 19 Mont. B.R. at 112-13 (quoting *Janssen Charolais Ranch*).  The Ninth Circuit in *Fowler* approved this Court's use of the formula approach in a Chapter 12 case, but remanded the case for findings regarding the risk of default and nature of the security when it was unable to determine the basis for the bankruptcy court's 0.75 % risk factor or the district court's slightly higher factor.  *Fowler*, 903 F.2d at 698-99.

The United States Supreme Court in a Chapter 13 case, *Till v. SCS Credit Corp.*, 541 U.S. 465, 478-80, 124 S.Ct. 1951, 1961, 158 L.Ed.2d 787 (2004) (plurality opinion), adopted the formula approach over other approaches to establish a cramdown rate.  Together with *Till* and the Ninth Circuit precedent in *Fowler*, this Court considers its long-standing formula approach still good law.

Debtor's Second Amended Chapter 12 Plan provides for an interest rate of 4.25% for all secured creditors. The Court takes judicial notice that the prime rate of interest has been 3.25

15

Created by Neevia Document Converter trial version http://www.neevia.com

percent for a lengthy period of time.  The next step requires that a risk factor be added to the prime rate.  Risk is heightened to an extent based on the unpredictable nature of the agricultural economy.  *Fowler*, 903 F.2d at 697, citing *United States v. Doud*, 869 F.2d 1144, 1145 (8th Cir. 1989).  *Fowler* further requires consideration of risk of default and the nature of the security. COLLIER adds that the risk adjustment depends also on the duration of the payment stream and should be high enough to compensate creditor for risk, but not so high as to doom the plan.  8 COLLIER ON BANKRUPTCY, ¶ 1225.03[4][c] (discussing *Till v. SCS Credit Corp.*, 541 U.S. 465, 480, 124 S.Ct. 1951, 1961, 158 L.Ed.2d 787 (2004) (plurality opinion)).  COLLIER also discusses cases considering a range of risk factors at ¶ 1225.03[4][c] n.28, and states that although the parties can present evidence of risk factors at a hearing, the evidentiary burden is placed on the creditor to substantiate any risk adjustment over a moderate level.  COLLIER, ¶ 1225.03[4][c]; *Till*, 541 U.S. at 484-85.  At the confirmation hearing, neither the Bank nor Lena offered any evidence regarding risk factors, and thus failed their evidentiary burden under *Till*.

Applying the *Fowler* test, as set forth by this Court in *Brummer*, the Court concludes that a risk factor of 1 percent is not unreasonable where the secured parties are, at this time, more than adequately protected by Debtor's equity cushion in the property.  *See also In re Steinmetz*, 10 Mont. B.R. 150, 158 (Bankr. Mont. 1991) ("the prime rate of interest at 8% plus 1% for risk due to probability of non-payment in the future due to non-payment since April, 1990, and insufficient cash flow to fund unsecured claims is the proper market rate of interest.").  Based upon the foregoing, the current rate of interest which allows the Bank and Lena the present value of their claims is 4.25 percent.  Accordingly, the Court concludes that Debtor's Second Amended satisfies the requirements of § 1225(a)(5)(B)(ii) in that it contains an appropriate cramdown rate

16

Created by Neevia Document Converter trial version http://www.neevia.com

for the Bank's and Lena's secured claims under the formula approach, particularly where Debtor's real property, excluding his personal residence, has an appraised value of $3,000,000.00, which value is not contested by the Bank or Lena.  *See Associates Commercial Corp. v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997) ("In allowing Chapter 13 debtors to retain and use collateral over the objection of secured creditors...the Bankruptcy Code has reshaped debtor and creditor rights in marked departure from state law... .  That change, ordered by federal law, is attended by a direction that courts look to the 'proposed disposition or use' of the collateral in determining its value.").  The appraised value of the real property clearly exceeds the amount of the Bank's $1,215,510.29 secured claims and also exceeds the amount of the Bank's and Lena's combined secured claims.

In addition to a reasonable market rate of interest, § 1225(a)(5)(B) requires that a debtor provide for payments to creditors over a reasonable market term.  *In re Steinmetz*, 10 Mont. B.R. at 158.  In this case, one can imply from Debtor's Second Amended Chapter 12 Plan that any payments creditors can expect to receive will be received on or before December 31, 2012.  In particular, Debtor proposes to sell certain of his real estate and pay his creditors in full. However, if Debtor is not successful in selling certain identified property and paying his creditors in full by July 1, 2012, Debtor then proposes to put a substantial amount of his real property up for auction by December 31, 2012, with the sales proceeds paid to creditors in the order of priority.  The Court does not have a particular problem with Debtor's proposal to pay his creditors in full by July 1, 2012 and indeed, if Debtor can accomplish such, the Court finds that Debtor's plan comports with § 1225(a)(5)(B) by providing for payments to creditors over a reasonable market term.

17

Created by Neevia Document Converter trial version http://www.neevia.com

    **c.**    **11 U.S.C. § 1225(a)(6).**

While Debtor's Second Amended Chapter 12 Plan technically satisfies § 1225(a)(5), the Court finds that Debtor's proposed method of paying his creditors in full by July 1, 2012, is flawed and thus, the Court finds that Debtor's Second Amended Chapter 12 Plan does not satisfy § 1225(a)(6), which requires a finding by the Court that "the debtor will be able to make all payments under the plan[.]"

William Bandy ("Bandy") appraised Debtor's real property and, excluding Debtor's personal residence, assigned a value of $3,000,000 to such real property.  Notwithstanding Bandy's appraisal, at the time of hearing, Debtor had listed only 343.98 acres for sale at a price of $1,450,000.  The aforementioned acreage has been listed for over one year and Debtor has not received a single offer.  In addition to the 343.98 acres located in section 3, Debtor proposes to now list the W½ of Section 5 and all of Section 6 for sale at an additional price of $1,750,000. Debtor wants until December 31, 2010, to see if he can sell the 343.98 acres, the W½ of Section 5 and all of Section 6 for a price at or near $3.2 million.  If Debtor is not successful in selling the 343.98 acres, the W½ of Section 5 and all of Section 6 in 2010, Debtor then wants an additional year and one-half to see if he can sell the 343.98 acres, the W½ of Section 5 and all of Section 6 along with the remainder of section 5.

The problem with Debtor's proposal is that his own appraiser has determined that the value of all of section 3, less a 2.84 acre tract described in Certificate of Survey #604FC, Section 4: the E½, W½SW¼ and the SE¼SW¼, and all of sections 5 and 6, is $3 million, yet Debtor wants to propose a plan that provides for the piecemeal sale of his real property at prices that simply are not supported by the record.  The method under which Debtor proposes to sell his real

18

Created by Neevia Document Converter trial version http://www.neevia.com

property is purely visionary and courts cannot confirm plans that are purely "visionary," *Pizza of Hawaii, Inc. v. Shakey's, Inc. (Matter of Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985).

> This Court fashioned the test for feasibility under Chapter 12 on a prior occasion as thus:

> [T]he benefit of the doubt in Chapter 12 cases will be given to farmers, if it appears that a reasonable chance of meeting their payments as projected under a plan [sic].

*In re Rugg*, 8 Mont. B.R. 457 (Bankr. D. Mont. 1990) (quoting *In re Hansen*, 77 B.R. 722 (Bankr. N.D. 1987)). *See also Clarkson v. Cooke Sales & Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) ("although we sympathize with the [debtors], we find that the feasibility test is firmly rooted in predictions based on objective fact....[']Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.'"). Debtors, however, have the burden of proving that their Plan has a reasonable chance of success. *See In re Martin*, 66 B.R. at 926.

In a case such as this, where Debtor does not have sufficient income to fund any type of plan, Debtor must propose the liquidation of sufficient assets to payoff all his debts within a reasonable period of time. In the case *sub judice*, Debtor's Second Amended Plan does not meet such requirement. In order to satisfy such requirement, Debtor must propose a plan that contemplates the sale of all Debtor's real property save for perhaps Debtor's personal residence and the 20 acres or so on which Debtor's parents' reside. Such plan must provide that such property be placed for sale immediately at a reasonable price. Absent that, Debtor will not be able to proceed with this Chapter 12 bankruptcy.

Created by Neevia Document Converter trial version http://www.neevia.com

**4. Other Objections.**

Lena argues that Debtor's proposal to impose a conservation easement on Section 5 and 6 will not make the sale of Debtor's property more feasible.  Debtor's plan for a conservation easement was removed from Debtor's Second Amended Chapter 12 Plan.  Thus, Lena's objection on that point is moot.  The Court would note, however, that if Debtor should seek to place the conservation easement proposal back in his Chapter 12 Plan, Debtor has the burden of first showing that the conservation easement will benefit the bankruptcy estate.

Lena also maintains that the decision to accept or reject an offer should not rest solely with the Debtor.  Debtor did not contest this point and in fact, agreed that the Trustee should see all offers and that the Trustee should be integrally involved with the decision to reject or accept any offers.  With Debtor's consent, Lena's objection on this point is sustained.

Finally, Lena contends she is entitled to reimbursement for her attorney's fees.  The Court sees no opposition to such request by Debtor.  The only caveat is that as an oversecured creditor, Lena must file an appropriate fee application with this Court in order to receive payment for her post-petition attorney's fees.  Absent an appropriate fee application, neither this Court nor Debtor are able to ascertain the amount or the reasonableness of Lena's attorney's fees.

 For the reasons discussed above, the Court finds that Debtor has not satisfied all the requirements for confirmation set forth in § 1225.  Accordingly, the Court will enter a separate order providing as follows;

IT IS ORDERED that Lena Tamcke's and the Bank of Deer Lodge's objections to confirmation based on 11 U.S.C. § 1225(a)(6) are sustained; Lena's objection that the Chapter 12 Trustee should be integrally involved with all offers on Debtor's real property is sustained; and

Created by Neevia Document Converter trial version http://www.neevia.com

all other objections to confirmation of Debtor's Second Amended Chapter 12 Plan are overruled.

IT IS FURTHER ORDERED that confirmation of Debtor's Second Amended Chapter 12 Plan filed December 8, 2009, is DENIED; that Debtor shall have through January 28, 2010, to file a further amended Chapter 12 plan; that any objections to confirmation shall be filed by February 4, 2010, and that the hearing on confirmation of Debtor's further amended Chapter 12 plan shall be held **Thursday, February 11, 2010, at 09:00 a.m.**, or as soon thereafter as the parties can be heard, in the 2ND FLOOR COURTROOM, FEDERAL BUILDING, 400 N. MAIN, BUTTE, MONTANA.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

21

Created by Neevia Document Converter trial version http://www.neevia.com